**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

Joseph W. Cole, II, et al.,

    Plaintiffs,

                            Case No. 2:04-cv-738

    v.

                            JUDGE GRAHAM

American Community Services, Inc.,

    Defendant/Third-Party Plaintiff,

    v.

U-Gold Key, Inc., et al.,

    Third-Party Defendants.

### Opinion and Order

This case arises from an incident between Third-Party Defendant Sean Marcelis ("Marcelis"), a door-to-door magazine salesperson, and Plaintiffs Joseph Cole, his wife Carla Cole, and Mrs. Cole's daughter, Keile Hambrick (collectively, "Plaintiffs"). Plaintiffs allege that Defendant American Community Services ("ACS") is directly liable for negligently hiring, supervising, and retaining Marcelis. Plaintiffs further that claim ACS is liable under the doctrine of respondeat superior for Marcelis's trespass, invasion of privacy, and intentional or negligent infliction of emotional distress to Ms. Hambrick. ACS denies that it employed Marcelis and alleges that he was an independent contractor for Third-Party Defendant Unified Producers, Inc. ("Unified").

ACS filed a Third-Party Complaint (Doc. 14) against Marcelis, Unified, The Doers, Inc. ("Doers") (allegedly a successor in interest to Unified), and U-Gold Key, Inc.[1] requesting indemnity or

---

[1] ACS voluntarily dismissed U-Gold Key, Inc. from this case (Doc. 40).

contribution if ACS is found liable on Plaintiffs' claims. This matter is before the Court on ACS's Motion for Summary Judgment (Doc. 53). The Court held arguments on the Motion on October 6, 2006, and for the following reasons, GRANTS ACS's Motion.

I.   **Summary Judgment Standard**

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." LaPointe v. United Autoworkers Local 600, 8 F.3d 376, 378 (6th Cir. 1993).

The movant has the burden of showing that there are no genuine issues of material fact in the case. LaPointe, 8 F.3d at 378. The moving party may meet its burden by showing that the nonmoving party lacks evidence to support an essential element of its case. Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A., 12 F.3d 1382, 1389 (6th Cir. 1993).

In response, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J. C. Bradford & Co., 886 F.2d 1472, 1476 (6th Cir. 1989) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986)). The Court must view the evidence, all facts, and any inferences that may permissibly be drawn from the facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). See also Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992).

In reviewing a motion for summary judgment, "this Court must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" <u>Patton v. Bearden</u>, 8 F.3d 343, 346 (6th Cir. 1993)(quoting <u>Anderson</u>, 477 U.S. at 251-52). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." <u>Anderson</u>, 477 U.S. at 247-48 (emphasis in original); <u>see generally Booker v. Brown & Williamson Tobacco Co., Inc.</u>, 879 F.2d 1304, 1310 (6th Cir. 1989).

Thus, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." <u>Anderson</u>, 477 U.S. at 252. <u>See also Gregory v. Hunt</u>, 24 F.3d 781, 784 (6th Cir. 1994). Finally, a district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. <u>Adams v. Metiva</u>, 31 F.3d 375, 379 (6th Cir. 1994).

## II. <u>Facts</u>

On April 7, 2003, at approximately eight o'clock in the evening, Plaintiffs were at their home in Westerville, Ohio, when Marcelis rang the doorbell selling magazines. Mrs. Cole and Ms. Hambrick were upstairs. Mr. Cole answered the door.

Cole alleges that he listened to Marcelis's "sales pitch," but declined to purchase any magazine subscriptions. According to Cole, Marcelis then stuck his foot in the door to prevent Cole from closing it. Marcelis pushed the door open and shouted at Cole.

Cole told Marcelis to leave, but he refused.

Marcelis then crossed the threshold into the Coles' home, yelled at Cole, threatened to beat him, and shoved him backwards into a wall. Cole finally called to his wife, asking her to call the police. Cole "maneuvered" Marcelis into the front yard; shortly thereafter Genoa Township police arrived. (Plfs.' Mem. in Opp. to Def.'s Mot. for Summ. J., Ex. 1, Affidavit of Joseph W. Cole, II ("Cole Aff.") ¶ 16.)

ACS is an Indiana corporation with its principal place of business in Indiana. ACS processes and clears orders for magazines that are sold by companies such as Unified. ACS's principle argument is that it cannot be held liable for Marcelis's allegedly tortious behavior because Marcelis was an independent contractor of Unified, which was ACS's independent contractor.

ACS submitted the declaration of its President, Levan Ellis, stating that Marcelis was not its employee on April 7, 2003. (Def.'s Mot. for Summ. J., Ex. B, Decl. of Levan Ellis ¶ 3.) On April 7, 2003, ACS was engaged in an "Independent Contractor Agreement," with Unified, a "direct selling organization." (Id. ¶ 9.) ACS: 1) did not control the times or places that Unified conducted its business; 2) did not control the means by which Unified sold magazines; 3) did not control whether or with whom Unified contracted to sell magazines; 4) did not have the ability to cause Unified to terminate a relationship with anyone Unified contracted with to sell magazines; 5) did not have regular, daily communication with Unified; 6) made payments to Unified based on Unified's sales; and, 7) intended its relationship with Unified be "in the form of an independent contractor relationship." (Id. ¶¶

4

12-14, 16-17, 19.)  ACS did not have regular, daily communication
with Marcelis and, while ACS may have awarded Marcelis cash or
prizes based on the number of orders he procured for Unified,
Unified paid him for his work.[2]  (Id. ¶¶ 16-17.)  ACS avers it had
no relationship with Marcelis other than through its independent
contractor relationship with Unified.[3]  (Id. ¶ 20.)

In his deposition in a related state court case, Marcelis
testified that he was an "independent contractor, salesman," for
Unified beginning in 1998 or 1999 and continuing through Unified's
"merger" with The Doers, Inc.  (Def.'s Mot. for Summ. J., Ex. C,
Deposition of Sean D. Marcelis 17.)  Marcelis testified he had
never been arrested prior to this incident, nor does he know of any
customer complaints about him as a door-to-door magazine
salesperson, other than those associated with this incident, though
he is not "exactly" aware of how his company handles customer
complaints.  (Id. 79, 116, 127-128.)

## III. **Choice of Law**

ACS asserts that under Indiana law, Marcelis is an independent
contractor of Unified, an independent contractor of ACS.
Therefore, ACS cannot be held liable for Marcelis's alleged torts
or for negligently hiring, retaining, or supervising Marcelis.  The
Independent Contractor Agreement between ACS and Unified states

---

[2]

When asked at oral argument if any evidence had been submitted in the
record that ACS had paid award monies or compensation to Marcelis, ACS's counsel
answered that no evidence to that effect has been introduced, and likewise the
Court has found none.  (Oral Argument Tr., 4-6, Oct. 6, 2006.)

[3]

Neither the Coles, nor ACS took depositions of any of Unified's
representatives or employees, however, ACS did submit Unified's responses to its
requests for admissions as Exhibit A to its Motion for Summary Judgment.  The
Coles did not depose anyone from ACS.  (Oral Argument Tr., 4, 13-14, Oct. 6,
2006.)

that Indiana law governs the agreement.  (Def.'s Mot. for Summ. J., Ex. 3, Independent Contractor Agreement, ¶ XI.)

Plaintiffs argue that Ohio law governs this dispute.  As Plaintiffs were not parties to ACS and Unified's contract, they challenge ACS's contention that Indiana law governs the determination of the nature of ACS's relationship with Marcelis due to the choice-of-law clause in that contract.

While choice-of-law provisions are generally enforced by federal courts and Ohio courts alike, see AMF, Inc. v. Computer Automation, Inc., 573 F.Supp. 924, 926 (S.D. Ohio 1983), "[t]o bind a non-party to a forum selection clause, the party must be 'closely related' to the dispute such that it becomes 'foreseeable' that it will be bound."  Washburn v. Garner, No. 5:04-CV-228-M, 2005 U.S. Dist. LEXIS 16623 at *30 (W.D. Ky. Aug. 10, 2005) (citing Baker v. LeBoueuf, Lamb, Lieby & Macrae, 105 F.3d 1102, 1106 (6th Cir. 1997)).  This reasoning would similarly apply to choice-of-law clauses.  Thus, it would not be foreseeable to bind Plaintiffs to the choice-of-law clause ACS and Unified bargained upon several years before this incident even occurred.  As such, the Court must engage in a choice-of-law analysis to determine whether Ohio, or Indiana, laws apply to the claims in this case.

A federal court sitting in diversity applies the choice-of-law provisions of the state in which it sits.  Rosen v. Chrysler Corp., 205 F.3d 918, 921 n.2 (6th Cir. 2000) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)).  Accordingly, the Court applies Ohio's choice-of-law rules to decide which state's laws govern Plaintiffs' claims.

Ohio courts apply the Restatement of the Law of Conflicts to

determine which state's substantive laws govern a tort dispute. Morgan v. Biro Mfg. Co.,Inc., 474 N.E.2d 286, 288-89 (Ohio 1984). Accordingly, "a presumption is created that the law of the place of the injury controls unless another jurisdiction has a more significant relationship to the lawsuit." Id. at 289. Plaintiffs' alleged injuries occurred in Ohio, and therefore, a presumption exists that Ohio law applies to this action.

The second step in the choice-of-law inquiry is to determine if another state has a more significant relationship to this action than Ohio. Id. The Ohio Supreme Court in Morgan instructed courts to consider the following factors in this determination: 1) the place of the injury; 2) the place where the conduct causing the injury occurred; 3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; 4) the place where the relationship between the parties, if any, is located; and 5) any factors under Section 6 of the Restatement of the Law of Conflicts,[4] which would be relevant. Id. Of the seven "Section 6" Restatement factors, the Court will examine factors two and three, the relevant policies of Ohio, versus the relevant policies of Indiana coupled with the relative interest of Indiana in the determination of this issue.

Beginning with the first four factors cited in Morgan, it is undisputed that:

---

[4] Those factors are: 1) the needs of the interstate and international systems; 2) the relevant policies of the forum; 3) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; 4) the protection of justified expectations; 5) the basic policies underlying the particular field of law; 6) certainty, predictability, and uniformity of result; and, 7) ease in the determination and application of law to be applied. Id. at n.6 (citing 1 Restatement (Second) of Conflict of Laws 10 § 6).

1)   Plaintiffs' alleged injuries occurred in Ohio;
2)   Marcelis's conduct allegedly causing Plaintiffs'
     injuries occurred in Ohio;
3)   Plaintiffs are Ohio residents, while ACS is an
     Indiana corporation with its principle place of
     business in Indiana; and,
4)   to the extent that any relationship between ACS and
     Plaintiffs exists, it is due to Plaintiffs'
     interaction with Marcelis, which occurred in Ohio.

Accordingly, these factors weigh in favor of applying Ohio law to this dispute.

With respect to the fifth factor, Indiana and Ohio both apply the general rule of law that an employer is not liable for the torts of an independent contractor, with certain exceptions in each state.[5] <u>Shell Oil Co. v. Meyer</u>, 705 N.E.2d 962, 978 (Ind. 1998)

---

[5]

Indiana recognizes five exceptions to the general rule and may impose liability on an employer for the torts of an independent contractor when:

(1) the contract requires performance of intrinsically dangerous work;

(2) a party is by law or contract charged with a specific duty;

(3) the act will create a nuisance;

(4) the act will probably cause injury to others unless due caution is taken to avoid the harm; or

(5) the act to be performed is illegal.

<u>Shell Oil</u>, 705 N.E.2d at 987 (citing <u>Bagley v. Insight Comm. Co., L.P.</u>, 658 N.E.2d 584, 586 (Ind. 1995), <u>Denneau v. Ind. & Mich. Elec. Co.</u>, 277 N.E.2d 8, 12 (Ind. Ct. App. 1971)).

Ohio recognizes three exceptions to the general rule:
(1) an employer may be liable for its own negligence in selecting or retaining an independent contractor;
(2) an employer may be held vicariously liable for the negligence of an independent contractor when the independent contractor was performing a non-delegable duty; and,
(3) an employer may be held vicariously liable for the torts of an independent contractor under an agency by estoppel theory.

<u>Mut. Ins.</u>, 2000 Ohio App. LEXIS 4038, at *6 (citing <u>Albain</u>, 553 N.E.2d at 1044; <u>Rubbo v. Hughes Provision Co.</u>, 34 N.E.2d 202 (Ohio 1941); <u>Johnson v. Wagner Provision Co.</u>, 49 N.E.2d 925, paragraph 4 of the syllabus (Ohio 1945)).

Neither party has argued that any of these exceptions, save for an employer being directly liable for its own negligence in hiring or retaining an independent contractor under Ohio law, would apply in this case.  The Court will

(citing <u>Allison v. Huber, Hunt & Nichols, Inc</u>., 362 N.E.2d 193, 195 (Ind. Ct. App. 1977)); <u>Mut. Ins. Co. of Eagle Twp. v. Hunt</u>, No. 5-2000-07, 2000 Ohio App. LEXIS 4038, at **5-6 (Ohio Ct. App. Sept. 7, 2000) (citing <u>Albain v. Flower Hosp</u>., 553 N.E.2d 1038, (Ohio 1990), overruled on other grounds by <u>Clark v. Southview Hosp. & Family Health Ctr</u>., 628 N.E.2d 46 (Ohio 1994); <u>Bostic v. Connor</u>, 524 N.E.2d 881, paragraph 1 of the syllabus (Ohio 1988)).  Indiana and Ohio courts also generally apply the Restatement (Second) of Agency § 220 factors[6] to determine whether an individual is an agent or independent contractor.  <u>Moberly v. Day</u>, 757 N.E.2d 1007, 1009-10 (Ind. 2001); <u>Bostic v. Connor</u>, 524 N.E.2d 881, 883-84 (Ohio 1988), superceded by statute, Oh. Rev. Code Ann. § 4123.01(A)(1)(c), as recognized in <u>Slauter v. Klink</u>, No. 18150, 2000 Ohio App. LEXIS 3716, at **7-8 (Aug. 18, 2000 Oh. Ct. App.) (finding that the common law agent versus independent contractor test recited in <u>Bostic</u> was superseded with reference to the definition of "employee" in workers' compensation claims).  In Ohio, the extent of control factor is predominant. In Indiana, no one factor is dispositive, but the extent of control factor is "'important.'"  <u>Moberly</u>, 757 N.E.2d at 1010 (citing Restatement

---

discuss this particular argument in Section IV, <u>infra</u>.

[6]
    These factors are: 1) the extent of control which, by the agreement, the master may exercise over the details of the work; 2) whether the one employed is engaged in a distinct occupation or business; 3) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; 4)the skill required in the particular occupation; 5) who supplies the instrumentalities, tools, and the place of work for the person doing the work; 6) the length of employment; 7) the method of payment; 8)whether the work is part of the regular business of the employer; 9)the belief of the parties; and, 10) whether the principal is or is not in business.  Restatement (Second) of Agency § 220.

(Second) of Agency § 220 cmt. D).

Because Ohio law and Indiana law are substantially similar in the application of agency principles, and because Plaintiffs' alleged injury and Marcelis's conduct giving rise to the alleged injury took place in Ohio, the presumption that Ohio law should apply to this dispute has not been overcome and the Court will apply Ohio law to Plaintiffs' claims.

## IV. Negligent Hiring, Supervision, and Retention

Plaintiffs first, second, and third causes of action are for ACS's negligent hiring, supervision, and retention of Marcelis. Plaintiffs specifically allege ACS "failed to conduct a reasonable investigation" of Marcelis before hiring him, failed to adequately supervise him, failed to terminate Marcelis's employment when ACS discovered he was "unsuitable" for his position, and that ACS knew or should have known of Marcelis's "propensity to engage in improper aggressive behavior, including . . . the act of placing his foot across the threshold of potential customers' doors" and "his propensity to threaten to do serious bodily harm to potential customers."  (Plfs.' Compl. ¶¶ 29-31, 37-39, 44-47.)

The elements of negligent hiring, supervision, and retention are: 1) an employment relationship between the employer and the wrongdoer; 2) evidence of the wrongdoer's incompetence; 3) evidence of the employer's knowledge of the wrongdoer's incompetence; 4) evidence that the wrongdoer's actions caused the plaintiff's injuries; and, 5) evidence that the employer's negligent hiring, supervision, or retention of the wrongdoer proximately caused the plaintiff's injuries. Browning v. Ohio State Highway Patrol, 786 N.E.2d 94, 104 (Ohio Ct. App. 2003) (citing Harmon v. GZK, Inc.,

10

No. 18672, 2002 Ohio App. LEXIS 480, at **41-42 (Ohio Ct. App. Feb. 8, 2002) (internal citations omitted)). Plaintiffs have failed to produce evidence showing that ACS knew or should have known of Marcelis's alleged propensity to engage in criminal, tortious, incompetent, or dangerous conduct, and therefore, their first, second, and third causes of action cannot withstand ACS's Motion for Summary Judgment.

In claims for negligent hiring, retention, and supervision "foreseeability [is] the test of employer liability." Dawson v. Airtouch Cellular, 42 F. Supp. 2d 767, 772 (S.D. Ohio 1999); Browning, 786 N.E.2d at 103, 104. Where a plaintiff fails to allege, much less show through evidence, that the employee had any criminal or tortious propensities, summary judgment in the employer's favor on negligent hiring and retention is proper. Id. at 773; see also Myers v. Goodwill Indus. of Akron, 721 N.E.2d 130, 133 (Ohio Ct. App. 1998) (even if the Ohio Supreme Court intended to have negligent retention claims apply to situations other than sexual harassment, the employer must have known about the misconduct and failed to act on its knowledge, such that the employer's failure to act caused the plaintiff's injury). A plaintiff's failure to show an employer had notice, actual or constructive, of its employee's tortious or criminal behavior or incompetence, is similarly fatal to a negligent supervision claim. See Harmon, 2002 Ohio App. LEXIS 480, at **44-45 (reversing trial court's grant of summary judgment in the defendant employer's favor on negligent supervision claim where the plaintiff presented evidence that the employer had actual or constructive knowledge of the tortfeasor's sexual harassment of the plaintiff).

11

ACS has supported its argument on these claims by proffering Marcelis's deposition testimony which indicates that Marcelis had never been arrested or jailed, or even had a customer complaint filed against him, prior to this incident on April 7, 2003. Plaintiffs have not countered with any evidence that Marcelis actually had a propensity, previous to the incident in question, to engage in criminal or tortious conduct, much less that Marcelis's conduct towards Plaintiffs was foreseeable such that ACS knew or should have known of Marcelis's allegedly dangerous propensities.[7]

Plaintiffs' argue that ACS contemplated this kind of conduct because its agreement with Unified included an indemnification clause holding it harmless against claims arising due to Unified's or its magazine salespeople's activities.  This argument is untenable as Plaintiffs have failed to show that ACS knew or should have known of Marcelis's alleged propensity to engage in tortious or criminal behavior.  The Court grants ACS's Motion for Summary Judgment on Plaintiffs' negligent hiring, retention, and supervision claims against ACS.

## V.  <u>Emotional Distress</u>

To prevail on a claim for intentional infliction of emotional distress a plaintiff must show: 1) the defendant either intended to cause emotional distress, or knew or should have known that his actions would result in serious emotional distress; 2) the defendant's conduct was so extreme and outrageous as to go beyond

---

[7]
    In fact, as indicated, <u>supra</u>, Plaintiffs never deposed anyone from ACS such that there is evidence ACS's actual or constructive knowledge of Marcelis's allegedly criminal or tortious tendencies or incompetence in the record.  (Oral Argument Tr., 14, Oct. 6, 2006.)  Likewise, at Oral Argument, Plaintiffs' counsel acknowledged that there is no evidence in the record showing that Marcelis had ever done anything similar to what he is accused of doing at the Coles' home prior to this incident.  (<u>Id</u>. at 15.)

all possible bounds of decency, and would be considered utterly intolerable in a civilized community; 3) the defendant's actions proximately caused the plaintiff's injury; and, 4) the mental anguish the plaintiff suffered was serious and of such a nature that no reasonable person could be expected to endure it. Yeager v. Local Union 20, 453 N.E.2d 666, 671 (Ohio 1983); Davis v. City of East Cleveland, Ohio, No. 1:03 CV 2075, 2006 U.S. Dist. LEXIS 11913 at *48 (N.D. Ohio Mar. 21, 2006). In Paugh v. Hanks, 451 N.E.2d 759, 765 (Ohio 1983), the Ohio Supreme Court, "underscore[d] the element of 'seriousness' as a necessary component" in a negligent infliction of emotional distress claim.

Mrs. Cole stated in her affidavit that she overheard the commotion between her husband and Marcelis. She was frightened and concerned for her family's safety. Mrs. Cole stated that for months after the attack, her daughter was afraid to be alone at home. (Plfs.' Mem. in Opp. to Def.'s Mot. for Summ. J., Ex. 2, Affidavit of Carla B. Cole ¶ 8.) Accordingly, Ms. Hambrick would call home before driving home to verify that someone else would be there, and would walk her into the house from the driveway where she parked her car to ensure her safety. (Id.)

Ms. Hambrick confirmed her mother's testimony in her own affidavit. (Plfs.' Mem. in Opp. to Def.'s Mot. for Summ. J., Ex. 3, Affidavit of Kiele Hambrick ¶ 9.) She felt anxious and nervous for months after the incident, and was afraid to shower or vacuum because she could not hear what was going on inside her home. She was afraid to go out in public, especially to dark, crowded places because she thought Marcelis might be stalking her. She had difficulty sleeping and still will not answer the door unless she

knows in advance who is present.

At her deposition, Ms. Hambrick testified that she did not seek any medical treatment or psychological care or counseling due to this incident. (Defs.' Mot. for Summ. J., Ex. E, Deposition of Kiele Hambrick 36.)  Nor did Ms. Hambrick miss any work as a result of this incident, except to testify in Marcelis's criminal trial. (Id. at 35.)  Ms. Hambrick's emotional distress claims fail because she has not offered any evidence that the mental anguish she allegedly suffered was serious, or in other words of such a nature that no reasonable person could be expected to endure it.

A plaintiff's emotional distress must be severe and debilitating. Yeager, 453 N.E.2d at 671; Paugh, 451 N.E.2d at 765. Severe and debilitating emotional distress may be found "where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." Paugh, 451 N.E.2d at 765.  Further, "a non-exhaustive litany of some examples of serious emotional distress should include traumatically induced neurosis, psychosis, chronic depression, or phobia." Id. at 759.

A plaintiff must provide some "guarantee of genuineness" of the seriousness of the emotional distress suffered to survive summary judgment. Buckman-Peirson v. Brannon, 822 N.E.2d 830, 837 (Ohio Ct. App. 2004) (quoting Paugh, 451 N.E.2d at 764).  While this may be in the form of expert medical testimony, such testimony is not required to defeat a defendant's motion for summary judgment. Id.  "[A] plaintiff may offer the testimony of lay witnesses acquainted with the plaintiff to show significant changes that they have observed in the emotional or habitual makeup of the

14

plaintiff." <u>Id</u>.  A court may determine as a matter of law if the emotional distress suffered by the plaintiff is serious. <u>Id</u>.; <u>Oswald v. Fresh/Mark Sugardale, Inc</u>., No. CA-8906, 1992 Ohio App. LEXIS 5756 at *8 (Ohio Ct. App. Nov. 9, 1992).

Defendant argues that Hambrick has not presented evidence that she suffered serious emotional distress of the extent required by Ohio law to support her claims for either intentional or negligent infliction of emotional distress.  Defendant points out that although Ms. Hambrick delayed her plans to move out of the Coles' home, she ultimately did move out of that home.  She did not miss work due to the incident, other than to testify in Marcelis's criminal trial, and never sought medical or psychological treatment due to the incident.

Ms. Hambrick's testimony regarding the severity of her emotional distress, alone, is not sufficient to defeat ACS's motion for summary judgment on those claims.  Ms. Hambrick has also offered her mother's testimony affirming that for several months after the incident she would not go home unless someone else was there, and would have someone escort her from the driveway to the house after parking her car.

Despite this change in Ms. Hambrick's behavior, however, Ms. Hambrick has failed to present evidence of severe and debilitating emotional distress because she did not miss any work due to this incident and never sought any medical or psychological treatment or care as a result of this incident.  As such, Ms. Hambrick's emotional distress claims cannot survive ACS's Motion for Summary Judgment.  <u>See</u> <u>Oswald</u>, 1992 Ohio App. LEXIS 5756 at **9-10 (the plaintiff failed to show the emotional distress he suffered was

severe and debilitating where plaintiff presented evidence of his nervous condition, inability to eat or sleep regularly for several months, and inability to function normally with his family, but did not seek any medical treatment and did not miss any work due to his emotional distress); Miller v. City of Columbus, 920 F. Supp. 807, 824 (S.D. Ohio 1996) ("[A]n emotional injury is not severe and debilitating where the plaintiff fails to show that he sought medical or psychiatric help or he was unable to work or otherwise function in his daily life.") (citations omitted).

**VI.  Invasion of Privacy and Trespass**

Plaintiffs remaining claims are that ACS is liable for Marcelis's alleged invasion of their privacy, solitude, or seclusion, and his alleged trespass under the doctrine of respondeat superior,[8] based on Marcelis's status as an agent or employee of ACS.  The doctrine of respondeat superior does not apply to an employer/independent contractor relationship. Wellman v. Montes, 288 F. Supp. 2d 860, 866 (N.D. Ohio 2003) (citing Councell v. Douglas, 163 Ohio St. 292, 295 (1955)).  Though the Wellman case discusses this rule in the context of negligence, this principle would be similarly applicable, if not more so, to intentional torts.  See Abrams v. Toledo Auto. Dealers Ass'n, 762 N.E.2d 411, 414 (Ohio Ct. App. 2001) (upholding the trial court's grant of a directed verdict in the defendant's favor on the plaintiff's defamation claim where evidence showed that the tortfeasor was an independent contractor, not an agent, of the

---

[8]    The doctrine of respondeat superior would also presumably apply to Ms. Hambrick's emotional distress claims, however, as explained, supra, those claims failed as a matter of law on other grounds.

defendant). ACS has presented evidence through the declaration of Levan Ellis that Marcelis was not its employee at the time of the incident. To rebut this argument, Plaintiffs rely on Marcelis's purported admissions to Cole during the incident that he worked for ACS and that he was wearing an ACS badge, in addition to interrogatory responses purportedly from Marcelis in the state court case in which Marcelis allegedly responded that his employer at the time of the incident was ACS, see infra.

In his affidavit executed on August 22, 2006, Cole alleged that after Marcelis refused to leave, Cole asked him where he worked, and Marcelis replied "American Community Services," touching the "American Community Services identification badge" he was wearing. (Cole Aff. ¶ 9.) Cole says he grabbed for the badge "to look at it more closely," and in the altercation the badge came off. (Id. ¶ 10.) According to Cole, he was examining the badge when Marcelis demanded Cole return the badge, and crossed the threshold into the Coles' home.

In contrast to his affidavit, in his deposition, given on June 20, 2006, Cole testified that he did not know what was listed on Marcelis's badge. (Def.'s Rep. to Plfs.' Mem. in Opp., Ex. G, Deposition of Joseph W. Cole, II ("Cole Dep.") 75.) When asked if he subsequently learned what name was on the badge, he answered, "American Community Services, I believe," but did not recall where he learned that information. (Id. at 75-76.) Cole stated he eventually learned that Marcelis "worked" for ACS, but could not recall how. (Id.)

Plaintiffs have also submitted interrogatory responses purportedly answered by Marcelis in a related lawsuit (captioned

Marcelis v. Cole, 04 CVC 04 231, pending in the Delaware County, Ohio, Court of Common Pleas).[9] Plaintiffs proffer the interrogatory responses to show that Marcelis "admitted" that he worked for ACS at the time of the incident. (Plfs.' Mem. in Opp. to Def.'s Mot. for Summ. J., Ex. 4, Marcelis's Answers to the Coles' and Hambrick's "First Set of Interrog. to Plf. Sean D. Marcelis" Res. 3).[10] The responses were not sworn or signed.

Plaintiffs assert that because Marcelis "admitted" that ACS employed him on the date of the incident, there is a genuine issue of material fact as to whether Marcelis was ACS's employee, such that ACS could be vicariously liable for Marcelis's torts. Plaintiffs putative evidence of Marcelis's "admissions" are Cole's affidavit, which is contradicted by his deposition testimony, and Marcelis's purported unsigned, unsworn interrogatory responses in the related state court case. Neither of these pieces of evidence are admissible. Plaintiffs did not submit any other evidence on the issue of who controlled Marcelis's work.[11]

### A.   Marcelis's purported interrogatory responses

---

[9]

The interrogatory responses recite Marcelis's version of the incident, which differs from Cole's. Marcelis claims that Cole grabbed his badge without provocation and that Cole was essentially the aggressor, shouting profanities at Marcelis and following Marcelis into his front yard. The Court must view the facts in a light most favorable to Plaintiffs for purposes of this Motion. Thus, even if the unsigned, unsworn interrogatories were admissible evidence, Marcelis's purported version of the incident is inapplicable at this stage of this case.

The response to interrogatory number three states that ACS was Marcelis's "former employer," in parentheses next to a downward arrow notation and what appears to be a "c/o" symbol followed by "Unified Producers."

[11]

Plaintiffs also argue that Unified ceased to exist as a legal entity prior to the incident giving rise to this case, and that, as such, Marcelis could not have worked for Unified at that time because Unified did not exist. The Court finds this argument to be irrelevant as to whether or not Marcelis was an agent of ACS at the time of the incident.

First, with respect to the purported interrogatory response, even if this were admissible evidence (i.e. by being signed, sworn, or otherwise authenticated, see Weems v. City of Columbus, No. 2:05-cv-87, 2006 U.S. Dist. LEXIS 65204, at **7-10 (S.D. Ohio Sept. 13, 2006 (discussing the inadmissibility of unauthenticated documents as evidence on a motion for summary judgment); see also Nelson v. City of Flint, 136 F. Supp. 2d 703, 715 (E.D. Mich. 2001) ("[u]nsigned discovery responses, without supplemental authentication, are inadmissible as evidence for purposes of Fed. R. Civ. Pro. 56."); Steele v. Jennings, No. 2:04-CV-189, 2005 U.S. Dist. LEXIS 18703 at *8 (S.D. Ohio Aug. 31, 2005) (evidence which has not been authenticated may be considered by the district court if the opposing party has not objected to its admission)), it would not be sufficient to bind ACS. Koos v. Storms, No. 84260, 2004 Ohio App. LEXIS 5453, at **19, 23-24 (Nov. 10, 2004) (finding, "[t]he assurances of one who assumes to act as an agent of his authority to bind another are not, standing alone, sufficient to prove his agency . . . . [t]he putative agent cannot create apparent authority alone," where the only evidence of the agency relationship between the co-defendants was the plaintiff's affidavit which alleged that co-defendant Storms "claimed" he was the agent of co-defendant Berkshire Halifax, and affirming the district court's grant of summary judgment in the putative principal's favor) (citing Info. Leasing Corp. v. Chambers, 789 N.E.2d 1155 (Oh. Ct. App. 2003)).

Further, the proffered response itself sheds no light on whom Marcelis worked for because his response lists both ACS and Unified as former employers. It would be impossible to discern what

Marcelis meant by this response.

    **B.   Marcelis's purported admissions to Cole**

Under long-standing Sixth Circuit precedent, "a non-movant may not create a genuine issue of material fact merely by contradicting his own testimony." <u>Harold v. United States</u>, No. 05-4217, 2006 U.S. App. LEXIS 20603 at *11 (6th Cir. Aug. 11, 2006) (citing <u>Reid v. Sears Roebuck and Co.</u>, 790 F.2d 453, 460 (6th Cir. 1986).

In his sworn deposition testimony, given on June 20, 2006, Cole testified as follows:

    Q.    Did you ever get - I know the badge came off.  We were talking about that.  Did you ever get to see his identification?
    A.    No.
    Q.    So during that whole incident, you had no idea what was on the badge?
    A.    No.
    Q.    You don't know if it was his name or -
    A.    No, because he came right after - I'm sorry.
    Q.    Okay.  So at that time, you didn't know who he was?
    A.    No.
    Q.    Nor what company's name was on the badge?
    A.    No.
    Q.    Okay.  Did you later come to learn the name of the company that was on the badge?
    A.    Uh-huh.
    Q.    Okay.  And what name was on the badge?
    A.    American Community Services, I believe.
    Q.    Do you recall where you got that information from?
    A.    I don't.
    Q.    At some point in time, did you learn of Mr. Marcelis's employment after this incident?
    A.    In what respect?
    Q.    Well, did you learn who he was working for?
    A.    Yes.  We learned, I can't recall how, that he worked for American Community Services.

(Cole Dep. 75:3-76:9, Jun. 20, 2006.)

In his affidavit, executed on August 22, 2006, Cole stated:

> Mr. Marcelis then pushed the door open and began to shout at me angrily.  I told Mr. Marcelis to leave the premises, but he did not.  I then asked Mr. Marcelis who he worked for, and he said, "American Community Services," as he touched the American Community Services identification badge that he was wearing.  I then reached out toward Mr. Marcelis to grasp hold of Mr. Marcelis' (sic) American Community Services identification badge in order to look at it more closely.

(Cole Aff. ¶¶ 8-10.)  Cole's affidavit contradicts his deposition testimony.  This is not a case in which the affidavit is offered to explain or supplement an individual's deposition testimony.  See Morgan v. Gandalf, Ltd., 165 Fed Appx. 425, 433 (6th Cir. 2006) (where the non-movant offers possibly contradicting statements, the statements must be viewed in the light most favorable to the non-movant to determine if the statements are, in fact, contradictory, or whether the subsequent statement clarifies and explains the prior statement).

In his deposition Cole said that he did not see what was written on Marcelis's badge, that he did not learn that Marcelis was allegedly employed by ACS until sometime after the incident and that he could not recall the source of that information.  In his affidavit, he states that during the incident Marcelis expressly stated that he worked for ACS and that he was wearing an ACS badge.  Cole has not explained how both of these versions of the events could be true.

Cole may not manufacture a factual issue with respect to Marcelis's employment by filing an affidavit which so clearly contradicts his previous sworn deposition testimony.

> 'It is well established that a party cannot create a genuine issue of fact by submitting an affidavit containing conclusory allegations which contradict plain

> admissions in prior deposition or otherwise sworn testimony.' If testimony under oath can be abandoned many months later by the filing of an affidavit, it is highly likely that no cases would be appropriate for summary judgment. Thus, a party should not be allowed to create issues of credibility by contradicting his own earlier testimony.

Mays v. Hunter, 717 F.Supp. 1247, 1250 (S.D. Ohio 1989) (citations omitted). Cf., Peck v. Bridgeport Mach., Inc., 237 F.3d 614, 619 (6th Cir. 2001) ("A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony.")

During oral arguments, the Court asked Plaintiffs' counsel how this apparent discrepancy could be reconciled. Plaintiffs' counsel argued as follows:

> Mr. Ferron: Well, when he's asked the question what all was on the badge and he said I don't know, I think that's a truthful answer. It doesn't mean it didn't say American Community Services on the badge. We're all familiar with these kinds of I.D. badges. The name of the company is the most prominent thing and readily recognizable. Who the person is, what their name is, the address and phone number that might be listed, that's harder to see, and you need to closely inspect it.
>
> Also, in his deposition when he was asked how did you know his name, how did you know the name of the company, he did at that point in time make note of the fact that the that the incident occurred more than three years ago, and he just couldn't remember at that time.
>
> Later on when he's sitting down preparing an affidavit with counsel, recollections come up, details are remembered, and they were properly accounted for in his affidavit.
>
> The Court: Well, there's nothing in his affidavit about any stroke of renewed or refreshed recollection, is there?

> Mr. Ferron: I don't think it's necessary.  Again, his affidavit is more detailed than the examination he underwent by defense counsel.
>
> Defense counsel didn't say I want you to tell me everything you could read or see from where you were standing that was on that badge.  He said what did it all say?  And Mr. Cole properly answered, I can't tell you.  I couldn't see it from where I was.
>
> . . .
>
> Mr. Ferron: the fact that on June 20th, 2006 he could not recall and the fact that he later recalled is inconsequential.  It creates--it is supplemental to what Mr. Marcelis himself said and what he said in his interrogatory answers that his counsel forwarded.

(Oral Argument Tr., 18-19, 20, Oct. 6, 2006.)

Cole did not offer <u>any</u> explanation in his affidavit as to why he testified at his deposition that, during the entire incident, he had no idea what was on the badge (not, as Plaintiffs' counsel argued, he had no idea what was on the badge in addition to ACS's name); and that at the time of the incident, he did not know who Marcelis was, nor what company's name was on the badge.  Cole testified in his deposition that he learned, at some point in time, that Marcelis worked for ACS.  It now appears that Cole's argument is that his recollection as to what was on the badge and where Marcelis stated he worked was refreshed at the time he testified in his affidavit.  However, his affidavit does not mention any recollection and does not attempt to explain his prior deposition testimony.

To allow Cole to testify in his deposition that at the time of the incident he did not know what was on Marcelis's badge and did not know who Marcelis worked for until after the incident, and then

offer contradictory testimony in his affidavit that during the incident Marcelis stated that he worked for ACS and touched his ACS badge, without also requiring Cole to state that his recollection was refreshed in between his deposition testimony and the drafting of the affidavit invites gamesmanship into summary judgment practice. Cole failed to explain these discrepancies in his affidavit, and because this condition was not met, Cole cannot be permitted to contradict his earlier deposition testimony with his affidavit.

### C.  Plaintiffs' additional legal arguments

Plaintiffs refer the Court to an allegedly similar case, DePiero v. American Community Services, Inc., for the proposition that a genuine issue of material fact exists as to whether Unified and Marcelis were ACS's independent contractors or agents. In that case, the plaintiffs sued ACS and The In-Crowd Enterprises, Inc. after a door-to-door magazine salesman of The In-Crowd's, kidnaped, robbed, and raped Mrs. DePiero. Plaintiffs' reliance on the DePiero opinion is misplaced. The ample evidentiary record on which Judge Haynes based his thorough analysis in DePiero, leading to his conclusion that "the undisputed facts . . . show that ACS exercised control over The In-Crowd's business operations by directing and overseeing The In-Crowd's day-to-day activities," starkly contrasts with Plaintiffs failure to proffer any evidence of who or what entity controlled Marcelis's [or Unified's] day-to-day operations in this case. (Plfs' Mem. in Opp. to Def.'s Mot. for Summ. J., Ex. 9, Mem. Op. in DePiero v. American Community Services, Inc. at 4.)

Finally, Plaintiffs cite to Bostic, 524 N.E.2d at 884-85, for

24

the proposition that if a plaintiff presents some evidence that an individual admits he is an employee or agent, rather than an independent contractor, an issue of fact is created for a jury's determination such that summary judgment is inappropriate. The Ohio Supreme Court reiterated that if an employer:

> reserves the right to control the manner or means of doing the work, the relation created is that of master and servant, while if the manner or means of doing the work or job is left to one who is responsible to the employer only for the result, an independent contractor relationship is thereby created.

Id. at 883 (citing Gillum v. Indus. Comm., 48 N.E.2d 234, paragraph 2 of the syllabus (Ohio 1943)). Other factors to be considered include: who controls the details and quality of the work; who controls the hours worked; who selects the other personnel, materials, and tools to be used; who selects the routes to be traveled; the length of employment and the type of business; the method of payment; and any pertinent agreements between the parties. Id. at 884.

In Bostic, the plaintiff, a truck driver, presented evidence that the defendant, a trucking company, controlled the manner by which Bostic performed his work. Id. at 884-85. Bostic was using the defendant's tractor-trailer at the time of his accident. Id. at 885. Bostic was paid the same percentage of the gross payment from the third-party recipient of the goods as any other employee. Id. The trucking company paid Bostic with a payroll check, provided him with credit cards, and withheld taxes from his pay. Id. From this evidence, the court found, a jury could reasonably infer that the trucking company was Bostic's employer, and thus affirmed the trial court's denial of summary judgment. Id.

25

ACS supported its Motion with the declaration of its President, Levan Ellis, stating that it did not control the manner in which Marcelis conducted his work.  The burden then shifted to Plaintiffs to show a genuine issue of material fact in this regard, which they have failed to do.

In contrast to the plaintiff in <u>Bostic</u>, Plaintiffs have presented no admissible evidence that would create a question of fact to be determined by a jury as to Marcelis's employment status on the date of the incident.  Even if Plaintiffs' evidence regarding Marcelis's "admissions" were admissible, these alleged admissions do not show who controlled the manner in which Marcelis conducted his work, the predominant factor in determining an individual's status as an agent or independent contractor.

ACS's Motion for Summary Judgment is well-taken and will be granted on Plaintiffs' invasion of privacy and trespass claims, as Plaintiffs have failed to show a genuine issue of material fact as to Marcelis's employment status on the date of the incident and judgment for ACS is appropriate as a matter of law.

**VII. <u>Conclusion</u>**

This Court GRANTS ACS's Motion for Summary Judgment.  The clerk shall enter final judgment in favor of ACS on all of Plaintiffs' claims, dismissing Plaintiffs' complaint with prejudice.  Costs shall be taxed against Plaintiffs.  ACS's Third-Party Complaint shall also be dismissed with prejudice as it is derivative of ACS's liability to Plaintiffs.

It is so ORDERED.

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

Date: October 17, 2006